argument. We'll most likely hear the first three and then take a recess and then finish with the final two cases. We begin with United States v. Daniels. Ms. Kuhn? Good morning, Your Honors. My name is Samantha Kuhn, and I represent Lazandy Daniels. As the Court knows, several issues were raised in this appeal, and so with the Court's permission, I'd like to focus on suppression today, but, of course, if the Court has any questions about the other issues... You don't waive anything that's in your brief, so... Thank you, Your Honor. With respect to suppression, there's two questions that are really relevant to this appeal. The first question is, did Mr. Daniels have standing to challenge the warrantless searches of the hotel? And the second question is, if he did have standing, were those searches violations of his Fourth Amendment rights? Now, the initial question of standing, and the District Court found there was no standing in this case, and that was based on a misreading or misinterpretation of the Supreme Court's holdings in Olson and Carter. For Mr. Daniels to have standing, all he needed was a reasonable expectation of privacy in that hotel room, an expectation of privacy that society would recognize as objectively reasonable. What's your strongest case for a situation like that, like this, where the room is registered in the name of someone else? I believe that, as far as the strongest case for where standing has actually been found, several of the cases that have gone up on appeal have actually been cases where they didn't find standing. But I think that those are very clearly distinguishable, because in those situations, it's always a clear line where the purpose of the person being in that room was a purely commercial purpose, and they had little to no ties to the actual person who was either renting the room or who was the leaseholder. Are there any cases that back your view, as opposed to distinguishable cases that back their view? I would say, actually, and I know that this is not a circumstance where it's a hotel room, but I would say Byrd is probably one of the strongest cases that supports this view, because in Byrd, the Supreme Court acknowledged that just because someone isn't the authorized owner or renter or leaseholder or person that's entitled to be occupying a specific space doesn't mean they necessarily don't have an expectation of privacy in that space. And so I think Byrd, and especially in Byrd, it was uncovered that the defendant had drugs and was engaging in illicit and commercial activity in that case, and they did not find that that somehow undermined his expectation of privacy, even though he wasn't the actual person renting the vehicle. So in Olson, the court created a spectrum. The Supreme Court recognized a spectrum, and that was reaffirmed in Carter. And in Olson, they identified someone who was an overnight guest as only one end of the spectrum. And that seems to be where the district court went wrong, because it appears from the opinion that the district court thought overnight status was actually dispositive of the issue, and not just one end of the spectrum that has to be considered. And in Olson and in Carter, the Supreme Court recognized that the other end of that spectrum was somebody who's just merely legitimately on the premises, someone who just is allowed to be where they are at the time the search occurred. Now in Carter, the court looked at a defendant's reasonable expectation of privacy in a situation where he had paid drugs to an apartment leaseholder to use her apartment for two hours for the sole purpose of packaging cocaine. And the court recognized that he had no previous connections and no relationship with that leaseholder. And so that combination of factors for the court, even though the court recognized it was in the gray area between the spectrum, the court looked at that combination of factors and said there was no expectation of privacy that society would recognize as reasonable. Now in this case, we have an entirely different scenario. All of the evidence that was presented at the suppression hearing and the trial showed that Mr. Daniels and Mr. James had a relationship going back several years, and that they were friends. The officers that were observing them that day even recognized that they looked like they were friends, they appeared to know each other very well, and that was based on their And during that time when they weren't in the hotel room, they were seen going to the grocery store, they were seen having a two-hour meal, and basically all of the circumstances, the totality of the circumstances show that their relationship was not purely commercial. It was a relationship that was based on social friendship. And just because it was later uncovered that Mr. James was conducting some kind of illegal activity in the hotel room, that does not change the analysis for standing. This court made that clear in vega, that just because illegal activities are occurring in the private space, that doesn't undermine somebody's reasonable expectation of privacy under the Fourth Amendment. So in this scenario, we would argue that standing is clearly present here because Mr. Daniels had a reasonable expectation of privacy in Mr. James' hotel room based on the long-standing friendship, the relationship, and the fact that they were together for 12 hours that even if it was ultimately discovered that there were drug proceeds or drugs in the apartment after the fact. And if there are no further questions on the standing issue, I'll move on to the actual Fourth Amendment searches. So in this case, with respect to the searches themselves, it's undisputed that there was no warrant before the officers entered that hotel room. And so in a situation like that, we start from a presumption that the search was actually unreasonable. And it's the government's burden to come back and provide some kind of legal justification that justifies their warrantless entry into that hotel room. And here, the government decided to rely on exigent circumstances, and specifically the imminent destruction of evidence. And the Supreme Court has said in Kentucky v. King that that's allowable as long as the officer's conduct preceding the exigency was reasonable. And in that case, the court upheld a Fourth Amendment search, but on the basis that they found no Fourth Amendment violation or threatened Fourth Amendment violation leading up to that entry. Here, that was not the case. The government's conduct leading up to this actual search began with what they called a knock-and-talk. And a knock-and-talk, as this Court has held and as the Supreme Court has recognized, is an investigative tool that's not meant to be a show of force, it's not meant to make demands on the occupants, and it's not intended to raid a residence. It's supposed to be a tool that's used purely to conduct an investigation and ask questions of the residents. And the whole purpose of a knock-and-talk, the whole background for why that's allowable, is that it's what's allowed in normal society by normal citizens. A knock-and-talk allows officers to do what any normal citizen can do, which is walk up to a house, knock on the door, and ask for permission to engage with the person inside or ask for admission. And this Court has repeatedly held, and so has the Supreme Court, that we've recognized that there are certain procedures that would be followed in a reasonable knock-and-talk. And that includes knocking on a door, briefly waiting for a response, and if you're not invited in or invited to linger longer on the doorstep, retreating cautiously, seeking a warrant, or conducting further surveillance. Again, the purpose is not to have a show of force and to try to demand entry into a place where you don't have a warrant to enter. And anything more intrusive or invasive than a general accepted knock-and-talk, that would be a Fourth Amendment seizure. That would be a violation of Fourth Amendment rights. And so in this case, we have a situation where we have ten agents who have decided to put on all of their tactical gear, strap themselves up with weapons, put on their bulletproof police vests, go up to a hotel room. One of them has an assault rifle in his hand, and they surround the hotel door. They then try to use a ruse to get entry into the hotel room by lying to the occupants about who they are, with the express hope, and this was explicitly testified, they're hoping that he'll open the door and not realizing it's the police. That alone would be a Fourth Amendment violation, because any consent that would have followed from that would have been invalid, because it would have been based on the deceit from the officers, and it wouldn't have been voluntary in knowing consent to allow the officers in. But then when that ruse didn't work and Mr. James refused to open the door, even though he acknowledged they were out there, they continued to knock and they continued to demand entry into the hotel room over and over again for several minutes, and the police officers even recognized some of the police officers that were not the one knocking said it went on for a pretty good while and went on for several minutes, and he continued knocking until they were able to identify an exigency that allowed them to get in. Any reasonable person in that scenario and in that hotel room would have felt like they were not free to leave, and that's a test for what is an unlawful seizure. Mr. James testified that he looked at the people and he saw marshals everywhere, and then they kept knocking and kept knocking and wouldn't leave when he clearly was not going to open the door for them. But even if that was not an actual unlawful seizure under the Fourth Amendment, at the very least, a reasonable person would view that as a threatened Fourth Amendment violation. The conduct of the officers made it clear that they were not leaving until they were allowed admission into that room or until they found a reason to bust in. But ultimately, the unreasonableness of all of this knock-and-talk conduct and the unreasonableness of the officers leading up to the entry, it doesn't even matter at the end of the day because there was no genuine exigency in this case. All right. Why don't you move on now while you have time left? Let's talk about the aiding and abetting charge. Talk about aiding and abetting as it relates to your client. As it relates to the sufficiency charges? That's right. Is there a specific question regarding it or? Well, tell us how the evidence is insufficient on aiding and abetting. I believe that the evidence is insufficient for aiding and abetting the conspiracy charges or the actual substantive charges because there was no evidence of any kind of intent or knowledge on the part of Mr. Daniels. With respect to the actual drugs that were found in that hotel room on that December 2nd raid, there was drugs found in the trash can by Mr. James, and that was it. He indicated that he intended at some point to provide them to Mr. Daniels, but that was all the evidence we had, that those were ever destined for his possession or that he was at all involved with it. Well, but Agent Del Valle said that he heard the toilet flushing, and then when the agents went into the bathroom, Mr. Daniels was sitting on the toilet with the lid down. Right. Are you saying a jury could not have concluded from that that Mr. Daniels was involved in aiding and abetting whatever scheme was underway? Well, first of all, I believe, and I may be incorrect, but I believe that Agent Del Valle's testimony was actually at the suppression hearing and not at the trial, so I don't believe that was actually before the jury. But in addition to that, at the trial, Mr. James testified, the testimony about the flushing of the toilet was, or what might have been flushed on the toilet was, there was no testing for residue to see if anything was actually flushed, and when Mr. James was questioned at trial about why Mr. Daniels went into the bathroom, he acknowledged Mr. Daniels ran to the back to the bathroom, but he was asked why that was happening, and he said he had no idea. And so there was no evidence that that was actually occurring, there was no physical evidence that drugs had been flushed on the toilet, and there was no testimony showing that that had happened. In fact, I know from the testimony that Mr. James had identified the drugs or the amount of roughly the amount of drugs that would be found in the hotel room, and that was consistent with no drugs being flushed down the toilet. So I think that that's wholly insufficient to show that he flushed anything down the toilet, and wholly insufficient to show that he was involved in any kind of aiding and abetting capacity with the drug dealing from there. Okay, anything else? Just regarding genuine exigency, I would just like to briefly address the fact that even if this Court doesn't find that the conduct leading up to the perceived exigency by the police officers was unreasonable and was sufficient to suppress the evidence, the exigency itself was not based on a reasonable belief of the imminent destruction of evidence. They had conducted, the officers had conducted nine hours of surveillance leading up to the knock and talk, and during that time, they had seen no evidence of actual narcotics in the room. At best, they believed that there might be some money, and they thought that they might have seen a gun go into the room. By 5 p.m., they knew the room number where Mr. James was staying, they knew that he was planning to check out the following day, and they knew that there had been money in the possession of people who had interacted with him. But they didn't go get a warrant at that point, they just kept ten agents stationed around the hotel room. And so, after 5 p.m., two hours passed, and they saw Leon Jackson emerge from the hotel room. And so, instead of following him like they did Joppa, to pull him over away from the hotel and out of sight, they approached him in the middle of the parking lot and tried to get more information from him about what's in the room. But for them, that was identical information to what they already had. There was no new information suggesting drugs were in the room. He had money in his possession, and he said he had been in the room, but he had only seen money and no drugs. When they didn't get the information that they wanted, they decided to conduct this knock and talk, and bring ten DEA agents armed up to the hotel room with the specific purpose of getting to see inside of that room. And when their initial ruse didn't work, they ended up pounding on the door over and over again, demanding entry, until they found this exigency. They heard a toilet flush, one agent heard a toilet flush, another agent smelled some burning marijuana. Now, there's several problems with this as serving as an exigency warranting the unjustified search. The first is the general reasonableness that underlies the Fourth Amendment. The Fourth Amendment, and as the Supreme Court has said, the touchstone of the Fourth Amendment is reasonableness, and that includes a consideration of proportionality. And that's absolutely relevant to considering whether it's reasonable for agents to bust down into a hotel room and conduct a warrantless search. And in this case, at best, even if we take all of the information as true, and assume Agent Greaves did smell marijuana, that would not justify this warrantless entry into somebody's private hotel room. But even beyond that, this Court has outlined five factors that should be considered in determining whether there are exigent circumstances justifying a warrantless search. And one of those is urgency, and one of those is a reasonable belief by the officers that there is the imminent destruction of evidence inside. And I focus on that phrase, reasonable belief. Greaves testified that James told them after the fact that Mr. Daniels did in fact flush drugs down the toilet, and that somebody had been smoking marijuana in the room. And that was the evidence that the District Court heard. But then at trial, Mr. James testified he never told any of the officers that anyone had been smoking in the room, but he admitted somebody had come in after she had smoked prior to coming to the hotel. And then it was 30 minutes later that the officers even approached. And with respect to the flushing, Mr. James testified he had no idea why Mr. Daniels went back to the bathroom. He didn't testify that he was going back there to flush drugs. All right. Your time has expired, and you've saved full time for rebuttal. Thank you, Mr. McClaren. Thank you, Your Honor. Mr. McClaren. Thank you, Your Honor. Good morning. May it please the Court. Ryan McClaren for the United States. I'm joined this morning by Brandon Long, who is trial counsel in this case. I want to respond to a couple of points. I want to start first with standing. It was, of course, Mr. Daniels' burden to establish standing in this case. Judge Malazzo brought this up at the suppression hearing. She said that standing is something that I'm concerned about. There are some factors that I would like to hear more about. For example, whether Mr. Daniels had a key to the room, whether he was a registered guest in the room, whether he was an overnight guest in the room. These were all things that Judge Malazzo said, I would like to hear more about this. And Mr. Daniels failed to present anything showing that he had standing to challenge a search of the hotel room. The factors that were before Judge Malazzo, again, that Mr. Daniels didn't have a key, that he wasn't going to be an overnight guest, that he didn't have any suitcases, that Mr. James paid for the hotel room, and importantly, that there was commercial activity going on inside the hotel room, that this wasn't purely personal activity, friends hanging out in the hotel room. This was two drug dealers renting the hotel room almost as commercial office space in which they would be packaging proceeds of their drug trafficking activity. You asked for opposing counsel's best case. She cited to Byrd, and Byrd announces these general legal principles, and I suppose that those general legal principles are helpful. Our best case, I would point to Phillips for the proposition that using a space for commercial activity, that that does matter for standing purposes, that this is something that this is. And so looking at all of these factors that were before Judge Malazzo, Judge Malazzo concluded that Mr. Daniels had no control over the room, that he, not that Judge Malazzo concluded, but the factors show that Mr. Daniels didn't have any control over the room, that he didn't have the ability to exclude others from the room, that this was renting the hotel room as a commercial office space for drug trafficking activity, that Mr. Daniels was a short-term guest, and thus he didn't have any standing, and for that reason, Judge Malazzo's findings as to standing are correct. I want to turn to the exigent circumstances issue. It's critical to note, and I want to direct the Court's attention to ROA 356, Note 18. That's where Judge Malazzo credited the testimony of the agents who testified at the suppression hearing, Agent DelValle and Agent Graves, who were there outside the motel room. And what did their testimony say? What did they perceive when they were outside the motel room? What did they know when they were standing outside the motel room? First, they knew that Mr. James, the head of this conspiracy, they had been told by a CI that he was a drug dealer, that he regularly came from Houston to New Orleans as part of his drug trafficking activity. They knew that James had met with the Jackson brothers, Joppa Jackson and Leon Jackson. They knew that the Jackson brothers were drug dealers. They later apprehended the Jackson brothers and found thousands of dollars in cash on the Jackson brothers. So what the agents know when they're standing outside the motel room is that there's all drug dealers at the motel, that they're meeting with each other, and that they're dealing with thousands of dollars in cash. The agents go up to the motel room. Yes, they try the ruse. There are seven to ten of them. Some of them are armed. And if that's all that there was in this case, then it would be a different analysis in this case. But that's not all that there was in this case. There was a break. And the break is the exigency that occurred. The officers announced their presence. They say, hello, we're the police, would you please let us in? They hear running around inside the room, they hear James come up to the door, look through the peephole. They hear all this commotion going on in the room. They hear the toilet flushing. The agents standing by the window signal to the agents standing at the door that they're flushing the toilet. Agent Del Valle testified that he kind of mimed the toilet flushing to Agent Greaves standing at the door. And at that point, based on all that they knew and based on the toilet flushing and hearing the commotion inside the room, the agents decided to breach the door and enter the motel room. Again, this was a break. This was an exigent circumstance that justified their warrantless entry into the motel room. I want to turn, unless there's any questions about the Fourth Amendment issue, I want to turn briefly to sufficiency. There was more than enough evidence in this case to support the three convictions even without the evidence from the motel room. There was testimony from James, the head of the conspiracy. There was testimony from the other drug dealers involved with this conspiracy, from Joppa Jackson and also from Donald Ely. And that testimony directly implicated Daniels in this conspiracy and this drug trafficking activity of bringing bricks of cocaine from Houston to New Orleans inside the doors of used cars. Other members of the conspiracy relied on Daniels, relied on his salvage yard, relied on his background as a mechanic working at the salvage yard to remove the doors, to take the cocaine out of the doors, to put cash in the doors, and then to send it back up to Houston. For his part, because he played this important role as part of the conspiracy, Daniels was fronted drugs. James and Joppa Jackson, James and Donald Ely testified that they were helping Mr. Daniels kind of get his crack dealing business up off the ground, that they would cook crack for him, that they would talk to him about how to cook crack. Also there was testimony from officers who witnessed Mr. Daniels engaging in hand-to-hand transactions in front of his house. There was video that the jury saw of Mr. Daniels engaging in hand-to-hand transactions in front of his house. All of this evidence supports the convictions for the three counts, and none of it has anything to do with the motel room. If there are no further questions, the government asks that this Court affirm Daniels' convictions on all three counts. Thank you. Thank you, Mr. McLaren.  Thank you, Your Honor. I have just a couple of brief points. The government says that they focus on Phillips as far as showing a lack of standing here. But as this Court well knows, and as Judge King, I know that you were on that opinion, know there was no permission for the defendant to be using the premises in that case the way he was using it. He claimed that because he knew the family that owned the shed, and he knew he was friends with them, and they were friends from way back, that gave him permission to be there and that justified his standing. But in that case, it was clear that he had no permission to use the shed, and the homeowner didn't even know he was using it, much less in the capacity that he was when he dropped drugs through the roof of the shed. As far as the credibility determinations of the District Court, of course, you know, credibility determinations by the District Court are within their purview and generally are kind of immune from scrutiny. But in this case, the District Court, first of all, didn't have the benefit of all the on the suppression issue. And second of all, it doesn't matter as far as the credibility as much as the reasonable belief element for why they justified their warrantless search into that hotel room. This Court doesn't have to question the District Court's credibility determinations in order to reach a finding that the officers did not reasonably believe that there was imminent destruction of evidence that was so urgent that they needed to enter that hotel room. And the government also discusses sufficiency in the context of without the evidence from the hotel room. And they focus on the testimony that came from the Jackson brothers and from Mr. James. But as the case law makes clear, verbal testimony is still suppressible as a fruit of an unlawful search. And in this case, most of that testimony, if not all of it, derived immediately from that warrantless search of the hotel room. They were able to bring in Mr. James and Mr. Daniels as co-defendants and it completely undermines the free will of any statements made by the co-defendants of this case or other people who they identified as a result of that search. In cases where verbal testimony has been allowed, the government has been required to show some kind of separation in the link between the testimony or the statements that were made and the actual warrantless search in the Fourth Amendment violation in order to get that kind of testimony admissible. And so, I would argue that if suppression is warranted in this case, it would be the responsibility of the district court to really evaluate to what degree all of the testimony and how the evidence should be suppressed and how much of the evidence came directly from that search. And just a couple of final points. As far as this Fourth Amendment search goes, the conduct of the officers leading up to the warrantless search of this hotel room was a clear, aggressive show of force. And they made it evident not only through their testimony but through their conduct that they were going into that hotel room one way or the other, whether they got consent or whether they had to find an exigency to break down the door. And in this case, if we allow this type of conduct to justify a warrantless search into a hotel room, it basically gives law enforcement the license to conduct these knock and talks in a way that is so aggressive and so persistent that it will inevitably result in either consent or they can just stand outside of a hotel room for as long as they need to in order to gain entry through some kind of exigent circumstance that they can identify. And we can't set the bar that low for the Fourth Amendment protections, where the touchstone and the cornerstone of that issue is reasonableness. And just as one, stepping back to standing, as one final point, I would just like to provide the court with a brief analogy. I know that it's hard to look past the illegal conduct and the drugs that were located in the hotel room in order to look at the standing view from a bird's eye view. But if the court considers, as I said before, Vega said that you cannot consider the illegal activities in determining whether somebody's expectation of privacy is objectively reasonable under the Fourth Amendment. And if you step back and take out the illegal component of the activity they're engaging in, I understand that commercial purpose is a factor this court considers. But commercial purpose is to be considered as if it was the sole purpose. And basically the reason for that is that it amounts to basically going to an apartment, to a hotel, purely for a business transaction and purely for a business deal. So I would contrast a case where, for example, if I want to purchase a couch on Craigslist and I go to the owner's apartment for the pure purpose of negotiating a price, viewing the product and potentially making a purchase, it would be unreasonable for me to expect him to share his privacy with me. In contrast, if I go to a friend's house and while I'm there she asks me to help her package products that she sold on eBay because she needs to mail them out, technically that's commercial activity, but I would still maintain the same reasonable expectation of privacy in her home as her guest. Thank you.